UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCOTT M. BENNETTS,

      *Plaintiff*,                    CASE NO. 1:15-CV-10087

*v.*                                DISTRICT JUDGE THOMAS L. LUDINGTON
                                MAGISTRATE JUDGE PATRICIA T. MORRIS

AT&T UMBRELLA PLAN NO. 1,

      *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**
(Docs. 18, 19)

**I.     RECOMMENDATION**

      Because the record lacks objective evidence that Bennetts is disabled under the AT&T

Umbrella Plan No. 1, I recommend **DENYING** Plaintiff's motion for judgment (Doc. 19) and

**GRANTING** Defendant's. (Doc. 18.)

**II.     BACKGROUND**

      Plaintiff Scott Bennetts brings this action for long-term disability ("LTD") benefits

against Defendant AT&T Umbrella Plan No. 1 (the "Plan") under the civil enforcement

provision of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1132.

Plaintiff was a participant in the AT&T Midwest Disability Benefits Program offered by his

former employer, Michigan Bell Telephone Company ("Michigan Bell" or "AT&T"), and

administered by Sedgwick Claims Management Services, Inc. ("Sedgwick").

      In April 2001, Michigan Bell hired Bennetts as a customer service specialist installing

above and below ground cable. Bennett's job duties consisted of installation and repair of

1

residential and business phone systems. (Pl. Cross Mot. Doc. 19, at 1.) All of the pertinent facts in this case appear in the administrative record. Under *Wilkins v. Baptist Healthcare System*, "the district court [is] confined to the record that was before the Plan Administrator." 150 F.3d 609, 615 (6th Cir. 1998). Defendant and Plaintiff filed their motions for judgment on the administrative record on October 30, 2015. (Doc. 18; 19.) Defendant filed a response on November 23, 2015. Accordingly, pursuant to E.D. Mich. LR 7.1(f)(1), these motions are ready for report and recommendation without oral argument.

III. **ADMINISTRATIVE RECORD**

A. **Relevant Plan Provisions**

Under the Plan, participants are entitled to LTD benefits when they meet all of the following:

- You have an illness or injury, other than accidental injury arising out of and in the course of employment by the Company or a Participating Company, supported by objective Medical Documentation,

- Such illness or injury prevents you from engaging in any occupation or employment (with reasonable accommodation as determined by the Claims Administrator), for which you are qualified or may reasonably become qualified based on education, training, or experience.

(SB0652.)

B. **Plaintiff's Initial Injury and STD Benefits**

In 2004, Bennetts sustained a back injury within the scope of his employment resulting in a cervical fusion at multiple levels in 2005. (Doc. 19, at 1.) Plaintiff returned to work after surgery. (*Id.*) In 2006, Plaintiff was diagnosed with "[s]tatus post cervical laminectomy at C3-4, C5-6; and a half of C7; anxiety and depression." (*Id.*) In October 2010, Bennetts underwent an MRI that reported:

2

> Impression: 1. Postsurgical changes of the cervical spine with metallic plate as seen as described above. 2. Disc osteophyte complex level C6-C7 with narrowing of neural foramina on the left side causing moderate spinal canal narrowing. Cervical sponsolosis at level C5-C6 also causing moderate spinal canal narrowing.

(SB0220-222). Bennetts received cervical epidural injections in November and December 2010. (SB0205-0219). Bennetts last day of work was November 10, 2010. (Doc. 19, at 1.) He received short-term disability ("STD") benefits under the Plan from November 23, 2010 through November 22, 2011. (*Id.*; Def. Mot. Summ. J. Doc. 18, at 2.)

### C.    Pre-Remand Administrative Record

On October 19, 2012, Plaintiff filed a complaint claiming that he was wrongly denied LTD benefits under the Plan. *Bennetts v. AT&T Integrated Disability Serv. Ctr.*, No. 12-cv-14640, Pls. Compl., ECF No. 1. On June 11, 2014, District Judge Thomas L. Ludington entered an order remanding the case to the plan administrator for further review. *Id.*, ECF No. 26, 25 F. Supp. 3d 1018 (E.D. Mich. 2014) (Hereinafter *Bennetts I*). I largely[1] adopt the administrative record as found by Judge Ludington as follows:

Prior to expiration of his STD benefits, Sedgwick informed Bennetts that he may be eligible for LTD benefits and invited him to submit information regarding his possible eligibility. (SB0190-204.) The letter stated that Bennetts needed to sign and return the enclosed forms within 14 days so that Sedgwick could evaluate his eligibility for LTD benefits. When Bennetts did not return the forms within 14 days, Sedgwick placed five follow-up phone calls with Bennett. (SB0003; SB0004-05; SB0006; SB0007.) During the telephone call on August 19, 2011, Bennetts explained that he was in physical therapy and would not know where he was in terms of recovery until he saw Dr. Adams on October 6, 2011. (SB0005.)

---

[1] For consistency and clarity I have adapted the formatting where necessary and made some grammatical or typographic changes. However the substance has not been altered.

3

On October 6, 2011, Dr. Adams noted that he met with Bennetts for a two month follow up with new x-rays done at Covenant.

> Patient states he is feeling great and having very little pain. He is having some muscle spasms. Once in a while he does have some tingling in both hands. Patient states that he has discontinues [sic] his physical therapy due to increase in pain whenever they had him use pulleys and weights.

(SB0268.) Dr. Adams also noted that: (1) Bennetts' VAS[2] pain score was one; and (2) Bennetts was having no side effects from the medication he was taking. *Id.* After performing a neurologic evaluation of Bennetts, Dr. Adams noted: "The patient is able to walk. The patient's sensation to pain and light touch is intact. The cranial nerves 2 through 12 are grossly intact. Romberg[3] is negative. Babinski[4] is negative." (SB0270.) After reviewing Bennetts' diagnostic testing, Dr. Adams wrote: "Reviewed results of x-rays fusion mass and alignment excellent." *Id.* Dr. Adams concluded that Bennetts had "displacement of cervical intervertebral disc without myelopathy" and that he "[n]eeds to remain off work." (SB0270-71.)

The next day, October 7, 2011, Dr. Adams completed Sedgwick's questionnaire regarding Bennett's STDs. Dr. Adams reaffirmed Bennetts diagnosis, displacement of cervical intervertebral disc without myelopathy, and then wrote that Bennetts was "to remain off work – w/ restrictions of no bending, twisting, pushing, pulling, reaching, stooping, or lifting more than 10 lbs." (SB0272.)

---

[2] The Visual Analog Scale (VAS) "is a testing technique for measuring subjective or behavioral phenomena (as pain or dietary consumption) in which a subject selects from a gradient of alternatives (as from "no pain" to "worst imaginable pain" or from "every day" to "never") arranged in linear fashion . . . ." *Visual Analog Scale*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/visual%20analog%20scale (last updated Apr. 18, 2012).

[3] A Romberg test is "a test for the presence of Romberg's sign by placing the feet close together and closing the eyes." *Romberg's Test*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/Romberg (last visited Apr. 29, 2016). Romberg's sign is "a diagnostic sign of tabes dorsalis and other diseases of the nervous system consisting of a swaying of the body when the feet are placed close together and the eyes are closed." *Romberg's Sign*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/Romberg (last visited Apr. 29, 2016).

[4] A Babinski sign is "a reflex movement in which when the sole is tickled the great toe turns upward instead of downward and which is normal in infancy but indicates damage to the central nervous system (as in the pyramidal tracts) when occurring later in life. . . ." *Babinski Reflex*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/Babinski (last visited Apr. 29, 2016).

About one month later, on November 1, 2011, Dr. Adams supplemented his response to Sedgwick's STD questionnaire and maintained that Bennetts would be unable to return to work:

1)  Is the patient able to return to work with restrictions? If so, please list them here:
No.
2)  Are the restrictions permanent or temporary?
Currently permanent.

(SB0289.)

On November 4, 2011, after reviewing the information sent by Dr. Adams, Sedgwick's Job Accommodation Specialist Priscilla Harris performed a transferable skills analysis based on Bennett's medical records, education, work history, and physical restrictions. (SB0277-79.) After reviewing Bennetts' medical history[5] and restrictions, Ms. Harris concluded that:

Mr. Bennetts retains the ability to work in situations that involve adhering to and achieving exact levels of performance, using precision measuring instruments, tools, and machines to attain precise dimensions. He also has worked in situations that involve solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria.

(SB0278.) Accordingly, Ms. Harris determined that Bennetts was capable of performing three sedentary occupations: a service order clerk, a routing clerk, and an order clerk.

On November 14, 2011, Dr. Adams completed Sedgwick's questionnaire regarding Bennetts' LTD benefits. Dr. Adams explained that Bennetts had "neck pain that radiates into bil[ateral] shoulders and down middle of spine" and that the "pain has increased" since his October office visit. (SB0291.) Dr. Adams noted that Bennetts' functional limitations

---

[5] Ms. Harris' recitation of Bennetts medical history provides one of the more complete descriptions, and therefore it will be reproduced here for additional context:

By way of summary, the employee is a 46-year-old Customer Service Specialist with AT&T. He was off of work 11/17/2010 due to severe neck pain (cervical disc displacement and cervical spondylosis without myelopathy). He is status post cervical fusion with disc osteophyte at C6-7 with central canal stenosis and bilateral neuroforaminal stenosis with a bilateral C6-C7 radicular pattern. He had ESIs on 1/9/10, 11/23/10, 12/7/10, which did not provide much relief. He underwent posterial cervical laminectomy C3-C7 with lateral mass instrumented fusion on 4/21/11.

(SB0277.)

5

permanently included "no strenuous activity, no repetitive pushing, pulling, bending, stooping,

[and] no lifting more than 5 lbs." (SB0291-93.) Finally, Dr. Adams addressed whether Bennetts

would be able to return to work in any capacity:

> 4.    How does BENNETTS, SCOTT M [sic] **impairment interfere with his ability to work at <u>ANY</u>** occupational capacity?
>
> Not able to work. . . .
>
> 6.    Has return to work been incorporated into BENNETTS, SCOTT M [sic] current treatment plan? **Please provide an estimated return to work date.**
>
> Permanently off work
>
> 7.    In an **eight-hour workday, BENNETTS, SCOTT M can**: (Circle full hourly capacity for each activity) [e.g. sitting, standing, walking]
>
> 0 [hours per day]

(SB0291-92.)

Sedgwick provided Dr. Adams November 14, 2011 questionnaire to Ms. Harris, who

responded that the new questionnaire had no impact on her original assessment that Bennetts was

capable of performing sedentary work. (SB0030.)

On November 18, 2011, Sedgwick sent Bennetts a letter stating that it was denying his

claim for LTD benefits. The letter stated, in part:

> Our determination to deny benefits is based on a review of medical documentation provided by Mark S. Adams, MD. This information indicated that you are status post cervical laminectomy at C3-4, C5-6, and half of C7 on April 21, 2011. Following the surgery a round of physical therapy was ordered [and] has since been discontinued due to pain exacerbation. Updated medical information received from Dr. Adams on November 14, 2011 provided a list of permanent restrictions and limitations as follows:
> *     No bending, twisting, pushing, pulling, reaching, stooping
> *     No lifting more than 5 pounds
> Because it was identified that you should be able to return to work with the above restrictions and limitations, a transitional skills analysis was completed. The

following alternative occupations were identified as position you would be able to perform

- Service Order Clerk
- Routing Clerk
- Order Clerk

Clinical information does not document a severity of your condition(s) that supports your inability to perform any occupation as of November 23, 2011.

(SB0308-18.)

On March 30, 2012, Bennetts, through counsel, submitted a letter stating his intent to file an administrative appeal of the denial of LTD benefits claim. Sedgwick responded by stating that Bennetts, on appeal, should provide medical evidence of his disability, including:

- A clear outline of your level of functionality

- A description of how your level of functionality impacts your ability to work and perform your daily activities

- A detailed description of the treatment provider's rationale for your level of functionality

- Clinical documentation that supports the treatment provider's rationale.

(SB0311.) On May 25, 2012, as part of his appeal, Bennetts provided several additional documents.

The first was a May 18, 2012 vocational rehabilitation analysis from Fuller Rehabilitations, LLC. During Mr. Fuller's examination, he noted Bennetts' description of his pain:

"I don't have many good days and I'm never without pain," he states that his pain level on a 1/10 scale is "at least an 8 constantly." When asked if there was any relief subsequent to his surgery he stated "the surgery was to prevent paralysis, but the pain never stopped." When asked what he does to control the pain in addition to taking prescribed mediation, he states "I lay down 50%-75% of the day, I'm in the Lazy Boy with a pillow to support my neck, then I go to the chaise, then to another chaise, then to bed. I use horseshoe pillows, but I find it best to sleep without a pillow." . . . [H]e also has difficulty with "the arms, to put

7

them out in front of me is painful, I have pain in the shoulders and down the arms, no overhead, and moving the arms to the side is also painful."

(SB0126-27.) Mr. Fuller noted that Bennetts "demonstrated obvious pain behaviors . . . ." *Id.*

As a result, Mr. Fuller concluded that Bennetts was incapable of performing any work even with restrictions:

> Based on the restrictions of Dr. Adams and the description by Mr. Bennetts of his physical capabilities, he would be incapable of even sedentary unskilled work. He has difficulty with sitting, standing, walking, lifting, postural activities, finds it necessary to recline the majority of the day, is in pain which, by most standards, would be considered extreme, is taking a number of narcotic pain medications, describes difficulty with concentration and attention, stating specifically "it's difficult with pain to concentrate" . . .
>
> As a result of the entire set of circumstances provided, it is clear that Mr. Bennetts is not a candidate for Vocational Rehabilitation services, has no wage earning capacity (unable to work even in sheltered employment), and his case file is being closed, unfeasible.

(SB0128.)

The second and third document Bennetts provided on appeal were letters from his neurologist, Dr. Adams. In a December 19, 2011 letter, after reviewing Bennett's surgical history, Dr. Adams opined that Bennett's pain would prevent him from returning to any type of employment:

> Scott is a very pleasant gentleman who has failed all conservative therapy. He has done physical therapy. He has done injections. These have not relieved his pain. He has had surgery that has also not relieved his pain. Unfortunately, due to the extent of his surgeries, I do feel that he is totally and permanently disabled. He would not be able to return to work in any position due to his severe limited range of motion at the neck. He would not be able to do any work where he had to look overhead. He would need to frequently change positions. He would not be able to sit at a desk and type for any length of time or any type of job where he had to sit with his head in a fixed position. Overhead work would be completely limited due to his range of motion, and any work where he had to turn his head frequently would also be contraindicated. He is extremely limited in his range of motion due to these reasons and the extensive cervical fusion that he has undergone. I truly feel that Mr. Bennetts would like to return to work and really hoped to be able to;

8

> however, it would be unrealistic that he would ever be able to return to any type
> of gainful employment due to the limitations that he has.

(SB0130.) Dr. Adams summarily reiterated this opinion in a February 12, 2012 letter: "Patient is

unable to return to work in any capacity due to restrictions of no pushing or pulling, no bending,

twisting, reaching above head, lifting more than 10 to 15 lbs. He will need to change position

frequently for pain relief." (SB0132.)

Bennetts also presented a disability certificate and a physician statement for the workers'

compensation bureau—both of which were completed by Dr. Adams. (SB0134-35.) The

disability certificate and the physician statement reiterated Dr. Adams' previous findings: that

Bennetts suffers from neck pain and has significant restrictions on his ability to push, pull, twist,

bend, and lift.

Dr. Adams also prepared a cervical spine residual capacity questionnaire for the Social

Security Administration, which Bennetts presented on appeal. Dr. Adams provides further details

on Bennetts' functional limitations. After summarizing Bennetts' prognosis as "bad," Dr. Adams

reported that Bennetts suffered from tenderness, muscle spasms, muscle weakness, chronic

fatigue, abnormal posture, "drops things," and reduced grip strength. (SB0136.) Dr. Adams

believed that Bennetts' pain would "constantly" interfere with the "attention and concentration

needed to perform even simple work tasks." (SB0138). Moreover, he emphatically indicated that

Bennetts would "not" be able to sit, stand, or walk in an 8-hour work day. (SB0139.)

Finally, Bennetts also submitted a November 10, 2011 progress note from Dr. Adams'

office. (SB0142-147.) Someone in Dr. Adam's office noted that:

> [Bennetts] is not going to be able to work in any capacity. He would not ever be
> able to do a sedentary job do to the fact that he would need. A frequent sit/stand
> option, no bending, lifting twisting of neck there would also be a 10-15 pound
> weight limit. No excessive push/pull. Because of these limits I do not feel he

would be able to return to work. I have discussed these restrictions with Dr. Adams and he agree. [sic throughout]

(SB0145.)

After receiving Bennetts' appeal documents, Sedgwick contracted with Network Medical Review Co. Ltd. to perform a medical review. (SB0153-156.) Dr. James T. Tran, a neurologist, completed the review and issued a report on June 12, 2012. In his report, Dr. Tran stated that "[a]ll medical information submitted to me was reviewed." In addition, Dr. Tran attempted to speak with Dr. Adams twice and Mr. Fuller three times. Neither Dr. Adams nor Mr. Fuller was available to speak with Dr. Tran. After noting Bennetts' surgical history, Dr. Tran explained that it was his belief that Bennetts' was not permanently disabled.

**1.    Is the employee disabled from any occupation as of November 23, 2011 through present?**

No. The patient is not disabled from any occupation as of 11/23/2011 through present. Even though he has neck and shoulder pain, he is neurologically intact. There is no clinical evidence of functional limitation from the neck and shoulder pain.

**2.    What is the treating provider's plan for return to work? In your opinion, is the employee capable of any work? If so, what work restrictions, if any, are necessary?**

The provider recommended limitations such as limited lifting, bending, and stooping at work. In addition, the patient would need 6-7 breaks per 8-hour shift. The treating provider mentioned that the patient would be absent from work 4-5 days per month. In my opinion, the employee is capable of any work without restrictions.

**3.    If disabled, what is/are the disabling diagnoses and complicating factors/comorbidities?**

There is no disability.

**4.    If disabled, what is the rationale or basis for the disability?**

There is no disability.

**5.      If disabled what is the expected/appropriate length of disability?**

There is no disability

**RATIONALE:** The patient is not disabled from any occupation as of 11/23/11. Dr. Adams stated that there was limited neck motion. However, even though Mr. Bennetts has neck and shoulder pain, he is neurologically intact. There is no clinical evidence of functional limitation from the neck and shoulder pain. The employee is not disabled from any occupation as of 11/23/11 through present.

(SB0155.)

On July 9, 2012, Sedgwick sent a letter to Bennetts denying his appeal for LTD benefits. The letter explained that the denial was based on Dr. Tran's opinion, Ms. Harris' November 14, 2011 transferrable skills assessment, and the absence of objective medical evidence of functional limitation in Bennetts' medical records. The letter noted that "Although some findings [of pain] are referenced, none are documented to be so severe as to prevent your client from working at any occupation or employment . . . ." (SB0162.)

### D.      Holding of *Bennetts v. AT&T Integrated Disability Serv. Ctr.*

As previously mentioned, Judge Ludington remanded Plaintiff's claim to the plan administrator for further review on June 11, 2014. In doing so Judge Ludington found that Dr. Tran's decision to deny benefits was arbitrary and capricious because it was not "based on a 'deliberate, principled reasoning process . . . supported by substantial evidence.'" (*Id.* at 21.) First, Dr. Tran's attempt to contact Dr. Adams and Mr. Fuller was unreasonable because he required that his calls be returned within twenty-four hours but did not explain the urgency of his calls. (*Id.* at 17.) Second, Dr. Tran failed to conduct an in-person examination which raised questions "about the thoroughness and accuracy of AT&T's review of [Bennetts] claim." (*Id.* at 18.) Third, Dr. Tran made credibility determinations regarding Bennett's self-reported pain and its effect on his functional limitations. (*Id.* at 18-19.) Fourth, Dr. Tran failed to use reasonable

11

procedures in determining that there was no objective or subjective evidence of disability because Dr. Tran did not explain "why he chose to summarily dismiss Bennett's complaints of pain." (*Id.* at 20.) In addition, Dr. Tran failed to explain why he rejected Dr. Adam's opinion. (*Id.*) Finally, the court found that it could not determine how to evaluate the objective evidence in the record because "[n]either Dr. Adams nor Dr. Tran explains . . . how the results of the MRI provide objective medical evidence supporting or undercutting Bennetts claimed functional limitations." (*Id.* at 22.) The court further noted:

> Given that Bennetts underwent a major surgical operation that could result in severe pain and functional limitations and the myriad of questions remaining concerning the medical evidence in the record, Dr. Tran's summary conclusion that there was no objective medical evidence of disability was arbitrary and capricious. He did not address specific findings by Bennetts's physicians that he was disabled or explain how his conclusion was consistent with the "quantity and quality of the medical evidence" on the record.

(*Id.* at 24.) Accordingly the court remanded the case to the plan administrator for further review.

### E.    Post-Remand Administrative Record

Following remand Defendant retained the services of Dr. Michael L. Levy, M.D. and Dr. Jamie Lee Lewis, M.D. On June 26, 2014, Sedgwick spoke with Dr. Adams office manager in an attempt to schedule a peer-to-peer teleconference. (SB0673-74.) The Plan administrator informed the manager that the case had been remanded and a teleconference was necessary to obtain any additional information as Bennetts' claim had been denied. (SB0674.) The office manager was also informed that if a teleconference could not be scheduled an unscheduled call would be made. (*Id.*)

On June 30, 2014, Dr. Lewis and Dr. Levy attempted to contact Dr. Adams. (SB0685; SB0690.) Dr. Lewis indicated that she spoke with Dr. Adams office manager who stated that "they have not seen [Bennetts] in over a year." (SB0690.) Dr. Lewis requested a callback within

twenty-four hours and indicated that if no callback was received "the report would be completed based on the available medical information." (*Id.*) No callback was received. (*Id.*) Dr. Lewis indicated that Mr. Fuller was unwilling to speak with her. (SB0689.) Dr. Levy spoke with Mr. Fuller who stated that he "has no opinion on whether the patient can return to work or not." (SB0686.) Dr. Lewis' call to Dr. Adams was also not returned. (SB0685.)

After reviewing Plaintiff's medical and rehabilitative history, Dr. Lewis opined that Bennetts "is not disabled from any job as of 11/23/11 through present." She explained:

> **2.    If disabled, what is the rationale or basis for the disability? Please explain your answer in detail.**
>
> From a physical medicine and pain perspective, the claimant would not be disabled, however would have some functional impairments.
>
> **3.    What are the clinical findings contained in the medical record and how would it impact the employee's ability to function, please include a review of the employee's previous spinal surgeries and how those surgeries impact the employee's pain and functionality?**
>
> Based on the documentation provided for review, it is reported that the patient was evaluated and treated on multiple occasions for ongoing neck pain. He is status post cervical fusion. On 11/10/11, it is reported that he does have some reduced strength however this is reported to be improving and is not described in the documentation following this date of service. After 11/10/11, he does not have any ongoing neurological features. Strength and sensation are intact. Given his history of cervical fusion, he would have some limitations based on alteration of spinal kinesiology, it would be recommended that he be restricted to lifting, carrying, pushing, and pulling 30 pounds occasionally, 15 pounds frequently, reaching overhead, and repetitive bending and twisting at the neck. He would have no other restrictions.
>
> **4.    Please review the MRI findings from 10/15/2010 and explain these findings in lay person terminology. Please explain whether the MRI results are or are not objective medical evidence of disability.**
>
> MRI findings reveal he does have a history of cervical fusion and cervical spondylosis causing spinal canal narrowing, however he does not have any compression of nerves limiting his ongoing functional capacity as outlined.

13

5.      **Would the employee's subjective complaints of pain impact his ability to function, please elaborate on your response?**

His subjective complaints would impact his ability to function in a heavy physical demand occupation given alteration of spinal kinesiology; however he would have the capacity to function with restrictions.

6.      **The treating provider, Dr. Adams, indicated on 11/14/2011 that the employee is permanently disabled from any work. In your opinion, based on a review of the medical documentation, is the employee capable of any work? If so, what work restrictions, if any, are necessary?**

Dr. Adams imposed restrictions of the employee's inability to work and need for permanent disability in excess for the claimant's clinical findings, as there are no ongoing neurological deficits.

**RATIONALE:** Based on the documentation provided for review, it is reported that the patient was evaluated and treated on multiple occasions for ongoing neck pain. He is status post cervical fusion. He does not have any ongoing neurological features. Strength and sensation are intact. Given his history of cervical fusion, he would have some limitations based on alteration of spinal kinesiology. He would have the capacity to work full time with the restrictions outlined.

(SB0690-92.)

On July 14, 2014, in response to a request for clarification Dr. Lewis provided the following explanations:

1.      **In your response to question 4 you noted that the he does not have any compression of nerves limiting his ongoing functional capacity as outlined. Please provide the source/basis for your statement and provide a detailed description of as outlined.**

Based on the MRI findings it is reported that there is minimal spondylitic changes of the cervical spine causing mild compression of thecal sac. There is narrowing of the neuroforamen especially on the left side. The thecal sac is otherwise well maintained. There is post-surgical changes of the cervical spine with metallic plate disc ostephyte comples at C6-7 with narrowing of the neuroforamina. There is cervical spondylosis at C5-6 causing spinal canal narrowing. Given findings of cervical spondylosis and surgical history evident on the MRI he would have the ability to function with restrictions.

14

**2.      In question 2 you indicate that the employee would have some functional impairments. Please provide a detailed explanation regarding how you came to this conclusion.**

In my initial review, the medical documentation describes that the claimant has undergone a cervical fusion which would alter his spinal kinesiology which would limit his ability for heavy lifting.

**3.      In response to question 3, you[] stated that it would be recommended that he be restricted to lifting, carrying, pushing, and pulling 30 pounds occasionally, 15 pounds frequently, reaching overhead, and repetitive bending and twisting at the neck and would have no other restrictions. Please explain in descriptive lay person terminology, how you reached the conclusion about the employee's restrictions.**

After review of the medical information the claimant does have ongoing symptoms of neck pain, however there is no reported weakness, or sensory changes. Given that he does have a history of fusion which would alter the cervical spine kinesiology but no reported neurological findings, it would be reasonable that he would have the ability to lift up to 30 pounds occasionally and 15 pounds frequently.

(SB0710-11.)

Dr. Levy, also opined that Plaintiff was not disabled on June 30, 2014, after reviewing

Bennetts' neurosurgical treatment history:

**2.      If disabled, what is the rationale or basis for the disability? Please explain your answer in detail.**

Not applicable

**3.      What are the clinical findings contained in the medical record and how would it impact the employee's ability to function, please include a review of the employee's previous spinal surgeries and how those surgeries impact the employee's pain and functionality.**

He is status post ACDF at C6-7 on May 16, 2006 and posterior cervical laminectomy from C3-C7 with lateral mass instrumentation and fusion on April 21, 2011. Given the absence of any current imaging studies or focal findings on current neurologic exams there is nothing to suggest any clinical findings contained in the medical record, which would impact the employee's ability to function at a sedentary to light level.

4.    **Please review the MRI findings from 10/15/2010 and explain these findings in lay person terminology. Please explain whether the MRI results are or are not objective medical evidence of disability**

…

The results of the MRI study dated October 15, 2010 are not objective medical evidence of disability. There are no current imaging studies or neurologic exams which document objective findings and would support an inability to function. The findings of diffuse 4/5 weakness throughout the patient's bilateral upper extremities is inconsistent with the patient's imaging studies at that time.

5.    **Would the employee's subjective complaints of pain impact his ability to function, please elaborate on your response.**

The employee's subjective complaints of pain would not impact his ability to function. There are no current imaging studies or neurologic exams, which document objective findings and would support an inability to function. The findings of diffuse 4/5 weakness throughout the patient's bilateral upper extremities is inconsistent with the patient's prior imaging studies.

6.    **The treating provider, Dr. Adams, indicated on 11/14/2011 that the employee is permanently disabled from any work. In your opinion, based on a review of the medical documentation, is the employee capable of any work? If so, what work restrictions, if any, are necessary?**

Based upon my review of the medical documentation, I disagree with the documentation on November 14, 2011 that the employee is permanently disabled from any work. From a neurological surgery perspective the employee is capable of work with restrictions at the light and sedentary levels based upon his prior cervical surgeries.

**RATIONALE:** From a neurological surgery perspective, based on a review of the medical documentation provided, I do not agree with Dr. Adams statement on November 14, 2011 that the employee is reasonably disabled from any work. From a neurosurgical standpoint, the patient is capable of work with restrictions at the light and sedentary levels (given his prior cervical surgery history).

The employee's subjective complaints of pain would not impact his ability to function. There are no current imaging studies or neurologic exams which document objective findings and would support an inability to function. The findings of diffuse 4.5 weakness throughout the patient's bilateral upper extremities is inconsistent with the patient's prior imaging studies.

16

(SB0686-88.)

On July 13, 2014, in response to a request for clarification Dr. Levy wrote:

1.   **Please elaborate your response to question 4 in original review and why the MRI dated October 15, 2010 is not objective medical documentation of a disability, please be descriptive in lay person terminology.**

The disk ostephyte complexes at C5-6 and C6-7 do indent the dura but do not compress the cervical cord at these levels. There would no [sic] objective anatomic correlation to support a myelopathy in this patient. The mild neural foraminal narrowing noted on the MRI at the C5-6 and C6-7 levels do not compress the exiting nerve roots to a point that radicular pain would be likely. Diffuse weakness of the arms could not be the result of these images in the absence of cord compression or multiple level nerve compression.

2.   **In question 4, 5 and the Rationale you indicate that the diffuse 4/5 weakness throughout the patient's bilateral upper extremities is inconsistent with the patient's imaging studies at that time. Could you please identify which imaging studies you are referring to and how this inconsistency impacts your conclusion.**

As noted above, the referenced study is the MRI dated October 15, 2010. The mild neural foraminal narrowing noted on the MRI at the C5-6 and C6-7 levels does not compress the exiting nerve roots to a point that radicular pain would be likely. Diffuse weakness of the arms could not be the result of these images in the absence of cord compression or multiple level nerve compression.
The inconsistency suggests that the findings of weakness during his exam are not supported by the MRI findings.

3.   **In question 3 you indicate that the employee is status post ACDF at C6-7 on May 16, 2006 and posterior cervical laminectomy from C3-C7 with lateral mass instrumentation and fusion on April 21, 2011. Please elaborate, based on the medical records available how these surgeries impact the employee's functionality?**

They could decrease range of motion (flexion-extension and rotation) of the cervical spine. It would not result in weakness or in radicular pain.

4.   **In question 6 you indicate that . . . the employee is capable of work with restrictions at the light and sedentary levels based upon his prior**

**cervical surgeries. Please provide a detailed explanation as to how you reached that conclusion.**

His ability to work would only be limited by subjective reports of pain and weakness.
There is nothing in the imaging to support an inability to work. It is standard and reasonable to recommend certain restrictions simply due to the history of cervical surgeries.

5.      **In your Rationale you disagree with Dr. Adams statement from November 14, 2011 that the employee is reasonably disabled from any work. Please describe in detail how you came your [sic] conclusion.**

As noted above, he is status post ACDF at C6-7 on May 16, 2006 and posterior cervical laminectomy from C3-C7 with lateral mass instrumentation and fusion on April 21, 2011. There are no subsequent images that support a pseudoarthrosis of foraminal compromise that would support a chronic pain picture.

The finding of diffuse 4/5 weakness of the arms cannot be explained by the images or by any neuroanatomical correlation related to surgery. There is nothing in the imaging or exams to support an inability to perform any work. It is standard and reasonable to recommend certain restrictions simply due to the history of cervical surgeries.

**RATIONALE:** As noted above, he is status post ACDF at C6-7 on May 16, 2006 and posterior cervical laminectomy from C3-C7 with lateral mass instrumentation and fusion on April 21, 2011. The mild neural foraminal narrowing noted on the MRI at the C5-6 and C6-7 levels does not compress the exiting nerve roots to a point that radicular pain would be likely. Diffuse weakness of the arms could not be the result of these images in the absence of cord compression or multiple level nerve compression. The inconsistency suggests that the findings of weakness during his exam are not supported by the MRI findings. There are no subsequent images that support a pseudoarthrosis of foraminal compromise that would support a chronic pain picture. The finding of diffuse 4/5 weakness of the arms cannot be explained by the images or by any neuroanatomical correlation related to surgery. There is nothing in the imaging or exams to support an inability to perform any work. It is standard and reasonable to recommend certain restrictions simply due to the history of cervical surgeries.

(SB 0706-07.)

On July 16, 2014, Defendant granted Plaintiff's counsel thirty days to rebut Dr. Levy's

and Dr. Lewis' reports. (SB0715.) Plaintiff did not submit any additional medical records. In a

letter, dated August 14, 2014, Plaintiff asserted that Defendant failed to comply with the *Bennetts I* order and that its decision process remained arbitrary and capricious because an IME was not conducted. (SB0735-37.) Plaintiff also noted that "in the event that [Defendant] did perform a physical examination at this time, it would not be time appropriate because Mr. Bennetts applied for long term disability benefits nearly two years ago. Consequently, his physical condition may have changed within that period of time . . . ." (SB0736.)

In a letter dated August 19, 2014, Defendant denied Plaintiff's LTD claim. (SB0747-49.) In reaching its decision Defendant adopted Dr. Levy and Dr. Lewis opinions and stated that Defendant agreed with Plaintiff's assertion that an Independent Medical Exam ("IME") would not be appropriate at this time. (SB0748-49.)

## IV.    STANDARD OF REVIEW

Generally, a denial of benefits is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Here, the Plan's terms indicate that the administrator has discretionary authority: "[a]ny determination made by the Plan administrator or any delegated third party will not be overturned unless it is arbitrary and capricious." (SB0666.) Moreover, the parties previously stipulated that AT&T's Plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the Plan. *Bennetts 1*, No. 12-cv-14640, ECF No. 1. In addition I note that the Plan is self-funded; (SB0665) thus Michigan Administrative Code Rule 500.2201-02 does not apply. *See Shumpert v. Disability Benefits Program for Hourly Employees*, No. 2:12-cv-14786, 2014 U.S. Dist. LEXIS 54850, 2014 WL 1600336, at *5 (E.D. Mich. Apr. 21, 2014); *Moskal v. Aetna Life Ins. Co.*, No. 10-14890, 2012

Dist. LEXIS 2599, 2012 WL 71845, at *3 (E.D. Mich. Jan. 10, 2012). The Court will review the determination under the arbitrary and capricious standard of review.

"The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 259 (6th Cir. 2006). The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Id.* at 165 (quoting *Jones*, 385 F.3d at 661). "Rather, this standard requires us to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Cooper*, 486 F.3d at 165. The administrator must consider the entire record, not selected portions. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002).

## V.    ANALYSIS

### A.    Evidence of Improvement

Plaintiff first contends that the denial of LTD benefits was arbitrary and capricious because there was no evidence in the record demonstrating any change or improvement in his condition since he was approved for STD benefits. (Doc. 19, at 12-14.) This argument was previously rejected by this Court in the order remanding Plaintiff's claim for further consideration. *Bennetts I*, 25 F. Supp. 3d at 1028-29. In *Bennetts I*, the court found that "the standard for qualifying for Short-Term Disability benefits is easier to meet than the standard for Long-Term Disability benefits under the plan." *Id.* at 1028. To qualify for STD benefits, under the Plan, Bennetts must show that he is unable to perform the functions of his job; whereas, to

qualify for LTD benefits, Bennetts must show that he is unable to perform the functions of *any* job. (*Id.* at 1028-29.) Thus, as the court explained:

> [B]ecause the standard changes, improvement in a claimant's condition is not a prerequisite to a determination that the claimant is no longer disabled. Hypothetically, a claimant's condition could stay the same and a rational finding could nonetheless be made that the claimant, while still disabled from his own occupation, could still perform the essential duties of some other occupation. Because there was a change in the standard by which Bennett's [sic] disability was evaluated, his argument that the termination of benefits was arbitrary and capricious simply because there was no improvement in his condition must be rejected.

(*Id.* at 1029.)

Moreover the cases cited by Plaintiff are inapposite because they address the denial of continued LTD benefits under the same standard; rather than the denial of LTD benefits to a participant receiving STD benefits. *Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 838 (8th Cir. 2008) (finding the denial of continued LTD benefits arbitrary and capricious); *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 15 (1st Cir. 2003) (same); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 588 (8th Cir. 2002) (same); *Conners v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 130, 136 (2d Cir. 2001) (same).

### B.    Defendant's File Reviews

Plaintiff next contends that Dr. Adams opinion that Plaintiff is disabled substantially outweighs the opinions of Defendant's hired record reviewers. *Bennetts I* held that Dr. Tran's opinion was arbitrary and capricious. Thus I will only address Plaintiff's arguments as they concern Dr. Levy, Dr. Lewis, and Ms. Harris.

First, Plaintiff argues that Dr. Lewis and Dr. Levy failed to make reasonable efforts to contact Dr. Adams. I note that Dr. Levy and Dr. Lewis  were not under an obligation to contact Dr. Adams before rendering their opinion. *Byrd v. Prudential Ins. Co. of Am.*, 758 F. Supp. 2d

492, 516 (M.D. Tenn. 2010) (ERISA has no "per se requirement that an independent reviewer must contact a treating physician.") However, failure to contact a claimant's treating physician may raise questions about the thoroughness and accuracy of the benefits determination. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 168 (6th Cir. 2007). If a reviewer contacts a treating physician the reviewer "does have to wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply." *Id.* In *Bennetts I*, Dr. Tran's attempts to contact Plaintiff's treating physicians were unreasonable because he required a response within twenty-four hours but failed to convey the urgency of his calls. *Bennetts I*, 25 F. Supp. 3d at 1030. Here, Sedgwick attempted to schedule and explained the importance of a teleconference to Dr. Adams office manager. (SB0673-74.) Since Dr. Adams failed to schedule a teleconference, Drs. Levy and Lewis attempted to speak with him over the phone. (SB0685, SB0690.) Dr. Lewis left a message explaining the importance of his call and asking Dr. Adams to return the call within twenty-four hours. (SB0690.) Neither doctor received a call back. Thus, I suggest that Drs. Levy and Lewis made a reasonable effort to speak with Dr. Adams.

Plaintiff next argues that Defendants decision is arbitrary and capricious because it failed to conduct a physical examination.[6] The Sixth Circuit recognizes that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Moreover, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296. However, the decision to conduct file reviews, rather than a physical

---

[6] I am unpersuaded that Plaintiff waived this argument by "conceding on remand that an IME in 2014 would not have shed light on Plaintiff's condition in November 2011, when he sought LTD benefits." (Doc. 20, at 6.) A more accurate reading of Plaintiff's rebuttal letter indicates that Plaintiff was reserving the rights to object to the results if Plaintiff performed an IME in 2014. (SB0736.) He clearly reserved the right to object to Defendant's failure to conduct an IME at the time that Plaintiff applied for LTD benefits. (*Id.*)

examination, is a factor properly considered in determining whether Defendant's decision was arbitrary and capricious. *Rose v. Hartford Fin. Servs. Grp.*, 268 Fed. App'x 444, 450 (6th Cir. 2008); *see also Hunter v. Life Ins. Co.*, 437 Fed. App'x 372, 378 (6th Cir. 2011) ("The failure to perform a physical examination is one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician."). In fact, "the failure to conduct a physical - examination especially where the right to do so is specifically reserved in the plan - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 296.

Here, AT&T specifically reserved the right, at its own expense, to have the claimant, "[r]eport for a medical examination by a Physician designated by the Claims Administrator if the Claims Administrator requires this examination . . . ." (SB0653.) Because the Plan reserved the right to examine Bennetts in person, the failure to do so raises questions about the thoroughness and accuracy of Defendant's review of his claim.

The decision to rely solely on a file review becomes especially meaningful when, as here, the file reviewer must make credibility determinations. *Hunter*, 437 Fed. App'x at 378 ("the lack of a physical examination is particularly troublesome where, as here, the file reviewers make critical credibility determinations."); *see also Calvert*, 486 F.3d 157 n.6. ("[T]here is nothing inherently improper with relying on a file review . . . . Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate."). Here, Dr. Levy and Dr. Lewis were forced to make credibility determinations regarding Bennetts' self-reported pain and its effect on his functional limitations because they did not examine Bennetts in-person.

Because of the inherent difficulties of making credibility determinations using only a file review, the reviewer must follow reasonable procedures in deciding whether a claimant is disabled. *Combs v. Reliance Std. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 59295, 2012 WL 1309252, at *9-11 (C.D. Cal. Apr. 26, 2012). "Reasonable procedures" require that the file reviewer perform a comprehensive, rather than selective, review of the records when rejecting claimant's self-reported symptoms. *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 739-40 (S.D. Ohio 2001). This is particularly true when there is, in fact, objective medical evidence of the underlying condition which forms part of the basis of an opinion that a claimant is disabled due to pain. *Id.* (where the record contained evidence of physical conditions that could reasonably cause pain, it was a "complete misreading of the medical records . . . to say that Plaintiff's complaints of pain or weakness . . . are subjective and unverifiable."). Indeed, even where there is no objective medical evidence, a file reviewer may not simply disregard subjective reports of symptoms. *Calvert*, 409 F.3d at 296.

Dr. Levy initially concluded that Bennetts' "subjective complaints of pain would not impact his ability to function." (SB0688.) He based this conclusion on the lack of objective evidence in the record. (*Id.*) He later clarified his opinion explaining,

> [t]he mild neural foraminal narrowing noted on the MRI at the C5-6 and C6-7 levels does not compress the exiting nerve roots to a point that radicular pain would be likely. Diffuse weakness of the arms could not be the result of these images in the absence of cord compression or multiple level nerve compression. The inconsistency suggests that the findings of weakness during his exam are not supported by the MRI findings. There are no subsequent images that support a pseudoarthrosis of foraminal compromise that would support a chronic pain picture.

(SB0707.) Dr. Lewis opined that Bennetts "subjective complaints would impact his ability to function in a heavy physical demand occupation given alteration of spinal kinesiology; however he would have the capacity to function with restrictions." (SB0692.) She later elaborated that

24

the claimant does have ongoing symptoms of neck pain, however there is no reported weakness, or sensory changes. Given that he does have a history of fusion which would alter the cervical spine kinesiology but no reported neurological findings, it would be reasonable that he would have the ability to lift up to 30 pounds occasionally and 15 pounds frequently.

(SB0711.) Thus neither Dr. Levy nor Dr. Lewis summarily rejected Plaintiff's subjective complaints of pain. They both provided reasonable explanations for their findings that he was not disabled despite those subjective complaints. *Cf. Bennetts I*, 25 F. Supp. 3d at 1031 (finding that Dr. Tran summarily rejected plaintiff's subjective complaints of pain because he merely stated that "[t]here is no clinical evidence of functional limitation from the neck and should[er] pain."); *Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d 779, 789-90 (S.D. Ohio 2008) (finding that Prudential ignored assertions of subjective pain during appeals process). Although Dr. Levy and Dr. Lewis made a credibility determination regarding Bennett's pain, without performing an IME, I suggest that this does not indicate that the decision was arbitrary and capricious because they followed reasonable procedures.

Plaintiff also contends that Dr. Levy and Dr. Lewis totally ignored Dr. Adams' November 14, 2011, recommendation that Bennetts needs to remain "permanently off work" and his December 19, 2011, recommendation that Bennetts "is extremely limited in his range of motion" and "would not be able to return to work in any position due to his severe limited range of motion at the neck." (Doc. 19, at 18). Specifically Plaintiff states that "Dr. Levy seemed to look for additional evidence outside the administrative record and limits his scope of his medical review to those records provided. In doing so, he fails to take into consideration Dr. Adams' limitations and opinions." (*Id.*)

A plan administrator "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn v. Metlife*, 461 F.3d 660, 671. Here both doctors specifically

25

explained why they disagreed with Dr. Adams' opinion. (SB0687; SB0692; SB707; SB0711.)
Dr. Lewis found that "Dr. Adams imposed restrictions of the employee's inability to work and
need for permanent disability in excess for the claimant's clinical findings, as there are no
ongoing neurological deficits." (SB0692.) Dr. Levy, explained that he disagreed with Dr. Adams
because Bennetts

> is status post ACDF at C6-7 on May 16, 2006 and posterior cervical laminectomy
> from C3-C7 with lateral mass instrumentation and fusion on April 21, 2011.
> There are no subsequent images that support a pseudoarthrosis of foraminal
> compromise that would support a chronic pain picture. The finding of diffuse 4/5
> weakness of the arms cannot be explained by the images or by any
> neuroanatomical correlation related to surgery. There is nothing in the imaging or
> exams to support an inability to perform any work. It is standard and reasonable
> to recommend certain restrictions simply due to the history of cervical surgeries.

(SB0707.) In addition, contrary to Plaintiff's assertion, Dr. Levy specifically references Dr.
Adams' November 14 and December 19 findings in his opinion. (SB0686.) And both doctors
directly addressed Dr. Adams' opinion in response to a question posed by Sedgwick. Thus I
suggest that Dr. Levy and Dr. Lewis reached their decisions to deny benefits based on a
"deliberate, principled reasoning process . . . supported by substantial evidence." Although they
relied on a file review involving credibility determinations they followed reasonable procedures,
and they provided reasonable explanations for rejecting the conclusion of Plaintiff's treating
physician.

With regard to the opinion of Ms. Harris, Plaintiff argues that she ignored Dr. Adams'
restrictions to sit/stand and lie down. (Doc. 19, at 16.) These physical restrictions were not
recommended by Dr. Levy or Dr. Lewis. Thus I suggest that Ms. Harris' failure to consider these
restrictions was not arbitrary and capricious.

### C.    Objective Evidence

Defendant argues that Plaintiff is not entitled to LTD benefits because the record lacks objective medical evidence of Plaintiff's functional capacity, and what is available does not demonstrate that Plaintiff could not perform any job. The Plan indicates that claimant is considered to have a LTD when he has "an illness or injury . . . supported by objective Medical Documentation . . . ." (SB0652.)

The Sixth Circuit has recognized the tension accompanying a claim for benefits for injuries with inherently subjective symptoms and the demand for objective evidence of the illness:

> Back-pain cases are notoriously hard to pin down: hard for a claimant to connect her complaints of pain to medical evidence; hard for a treating physician to explain how much of the diagnosis arises from objective evidence rather than from subjective complaints; and hard for a reviewing physician to verify the truthfulness of a claimant's complaints. All of this makes it particularly important for plan administrators to use a "deliberate, principled reasoning process" in reviewing benefits claims in this area . . . .

*Cooper*, 486 F.3d at 173 (Sutton, J. dissent).

Here, Bennetts suffered a neck and back injury that required two cervical fusion surgeries. Bennetts also suffered from subjective complaints of neck and back pain. Both a Romberg test and a Babinski test were negative, and Plaintiff's X-rays were "excellent." (SB0259-0261; SB0268-0271.) In *Bennetts I* the court found that the issue turned on an MRI which had not been adequately explained by Dr. Adams or Dr. Tran. The court further recognized that the two surgeries alone are objective evidence of Bennetts pain and functionality. *Bennetts 1*, at 1033 (citing *Ebert*, 171 F. Supp. 2d at 740 ("The single fact is that Plaintiff underwent major surgery . . . . It is a complete misreading of the medical records involved in this

case to say that Plaintiff's complaints of pain or weakness in the leg are subjective and unverifiable.") The court found that several questions remained after reviewing the record:

> Did Dr. Adams's base his conclusions of disability on Bennetts's subjective complaints of pain, or on his own objective findings developed through examination but not disclosed in the submitted notes? If Dr. Tran had examined Bennetts, as was his right, would he have arrived at the same conclusion as Bennetts's physicians? Would a telephone conversation between Dr. Tran and Dr. Adams or Mr. Fuller have convinced Dr. Tran that Bennetts was disabled?

*Bennetts I*, 25 F. Supp. at 1033.

These questions have not been answered on remand. Thus Plaintiff asserts that he is entitled to LTD benefits. However, I suggest that, unlike Dr. Tran, Drs. Lewis and Levy provided more in-depth explanations for their findings that the record lacked objective evidence of disability. Thus substantial evidence supports their finding that Plaintiff is not entitled to LTD benefits. Both explained that the MRI showed some narrowing of Plaintiff's spinal canal, but no compression of his nerves, which, if present, could limit his functional capacity and/or cause radicular pain. (SB0691; SB0706; SB0710.) They also explained that Plaintiff's MRI results did not explain his claims of weakness. Dr. Levy noted "[d]iffuse weakness of the arms could not be the result of these images in the absence of cord compression or multiple level nerve compression." (SB0706.) Drs. Levy and Lewis also considered Plaintiff's surgical history and opined that it could decrease his range of motion, but would not result in radicular pain or prevent Plaintiff from working. (SB0692; SB0707.) However, they recognized that Plaintiff would have some physical limitations and would be subject to work restrictions. Specifically Dr. Lewis opined that he would be limited to "lifting, carrying, pushing, and pulling 30 pounds occasionally, 15 pounds frequently, reaching overhead, and repetitive bending and twisting at the neck." (SB0692.) While less restricted than Dr. Adams recommendations that Plaintiff would have the following functional limitations: "no strenuous activity, no repetitive pushing, pulling,

28

bending, stooping, [and] no lifting more than 5 lbs," (SB0291-293,) Dr. Lewis' restrictions are in line with Dr. Adams. Thus unlike Dr. Tran, Drs. Lewis and Levy thoroughly reviewed the objective and subjective evidence of record and offered reasoned explanations for their decisions to deny LTD benefits.

In contrast, Dr. Adams offers only a conclusory assertion that Plaintiff is disabled "[d]ue to the extent of surgeries," in his December 19, 2011 letter. (SB0130.) He does not explain how the negative test results and positive x-ray finding affected his findings. Nor does he discuss the impact of the MRI. In addition, Dr. Adams findings are inconsistent. For instance in November 2011 he opined that Plaintiff could not lift more than five pounds; however in February 2012 Plaintiff could lift 10-15 pounds. (SB0291; SB0132.) There is no indication that Dr. Adams completed a physical examination such that a reasonable explanation exists for the change in his recommended physical restrictions.

Ultimately, the plan places the burden of providing substantial evidence of disability on the Plaintiff. (SB0652.) On remand, Defendant's review was deliberate and principled. Thus I suggest that substantial evidence supports their findings that the record lacks objective medical documentation of disability.

## VI.   <u>CONCLUSION</u>

For the reasons discussed above, I recommend **DENYING** Plaintiff's motion (Doc. 19) and **GRANTING** Defendant's motion (Doc. 18).

## VII.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to

another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

 Date:  May 3, 2016                                  S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 3, 2016                                   By s/Kristen Krawczyk
                                                    Case Manager